Thank you, Your Honor. Good morning. May it please the Court, my name is Irene Scruggs. I represent the Petitioner Public Power Council and will deliver argument on behalf of all the petitioners today except that Ms. Davison will argue the issue of standing for Petitioner ICNU. I plan to argue for 13 minutes and hoping to reserve about 3 or 4 of those minutes for rebuttal and Ms. Davison will address the Court in the remaining 7 minutes. Unless there are questions about the facts, I am not going to dwell on the facts other than to say that today we come back with a problem familiar to this Court and ask the Court to redress the pecuniary injury that BPA has caused the petitioners when it unlawfully gave its direct service industrial customers possibly as much as $153 million of our money and has now refused to make any effort to get that money back. BPA does not dispute in its brief that under the Appropriations Clause of the Constitution Can we go against those parties and get the money back? No, Your Honor. We have no privity with those parties. The contracts Privity is such an old-fashioned term. I haven't heard it since last year. Unfortunately, we have no redress against those parties. The contracts were specifically entered into between Why don't you bring a non-just enrichment claim against them? You know, Oregon courts are open. And you could say, look, you guys got all this money. It's our money, just like it just said here. And, you know, leave these people out of it, you know. And why don't you do that? Well, in these particular circumstances, as in other similar circumstances, typically it is the agency that committed the unauthorized act. I thought there was a case for precluding it. For one thing, ultimately, the only way you would actually get this money back is if your rates were then redone, and it's only the agency that can do that. That's absolutely right, Your Honor. That is precisely right. It's not exactly your money. So when you said it's your money, you were able to go to state. Well, Your Honor. I was just reacting to your statement. You said it's your money. It's your money and they got it. Then you should be able to go to the state court and get it back. Right? That's how law works. Well, Your Honor. It's not your money, is it? It might be your money. It might benefit you if they go ahead and get the money back and if they then adjust the rates. So it might trickle back to you, which bears on the standing question, right? That's absolutely right, Chief Judge Kuczynski. However, in PNGC 1 and 2, BPA has conceded that it paid out this money to its direct service industrial customers at the expense of the increased rates of the preference customers. It conceded that the rates would be different. Not what amount they would be different, but in some respect. That's right, Your Honor. And we – BPA has never conducted an analysis of how much the rates have gone up or how much money it actually paid out. We don't know that. But what BPA has not disputed is that under the Appropriations Clause of the Constitution, the payment of money from the Treasury must be authorized by statute. Instead, what BPA argues here is that the Constitution is neither implicated nor violated because it has never been established that the disbursement of money was unlawful. It would be helpful to me if you begin by telling me what the recent Alcoa case, where that leaves the – it seems to me that this whole Appropriations Clause argument goes to the validity of the waiver. And the Alcoa suit seems to uphold the validity of the waiver, or a waiver similar to this waiver. And so the question is, are there differences in the waiver? And, I mean, it was a rather short discussion, but it's there. And why isn't it binding on us? Your Honor, the Alcoa case is completely different. The facts in the case are materially different. And here's the key distinction. In the Alcoa case, the Court found the contract to be completely valid, completely lawful, and found that BPA – So then the whole waiver discussion was completely extraneous because the waiver was about what if it wasn't valid. So there was no point to even addressing it. Well, that's exactly right. And there were just merely a couple sentences, three or four at the most, if I recall correctly. But in that case, the issue was not teed up. The issue of BPA paying money that was not authorized by statute was not present. And that is the key difference that applies to this case. In this case, that is precisely what happened. BPA outlaid money that it was not authorized to do. And as a result, the constitutional duty and the statutory duty are triggered. And that is why, Judge Berzin, the Alcoa case is just an opposite here. But what BPA argues in this particular case is that its expenditures were, in fact, authorized because it has the general authority to market power to the DSIs. Congress has mandated that BPA operate with a business-oriented philosophy and that BPA conducts its affairs in a manner that is consistent with the sound business principles. In PNGC-1 and PNGC-2, this Court has already found that BPA's decision to pay money pursuant to the block contracts and the amended contracts was contrary to those statutory mandates. Of course, the BPA is always setting rates and those rates are always coming to us, which is a peculiar thing anyway, and we often fault them in some way. So, I mean, this may have been a big fault instead of a little fault, but still, how does your argument not apply any time we disapprove a BPA rate as somehow or other inconsistent with the statute? Well, this wasn't just a disapproval of a rate. This was BPA actually entering into a contract, Your Honor, for the payment of monetary service benefits. Kennedy, you don't know what this is. Did you hear the question? Yes, I did. Go ahead and answer the question, rather than reminding us of what the facts are. We know the facts. I appreciate that, Your Honor. I was just trying to do that. Because Berzon's question was why wouldn't this argument that you're applying to these facts, which we know, which you don't have to repeat, we do know the facts, why doesn't this same argument apply every time we undo something that BPA does as in a rate making? We know the facts are different. Don't remind us of that, because we do understand these are different facts. But in both circumstances, we are undoing some mistake that the BPA committed, and why wouldn't it always follow that they have to go back and run after them and get the wrongfully paid benefits? Well, Your Honor, BPA has in the past, at the direction of this Court, changed the rates or conducted some kind of a look-back process and adjusted the rates. I was just trying to draw the distinction that in this case BPA could apply. You're saying it would apply. It could apply, absolutely. Not necessarily. Ultimately, it is BPA's decision on how it's going to recoup the money. They made the decision here, we are not going to do it. Are you suggesting there's a difference between an error in rate making and a violation of a statute in acting beyond authority? Well, that's the distinction I was trying to draw, Your Honor. That's the case he wanted you to say. Well, some distinction between them. Now, I'm going to ask you why this is an important distinction or why it matters. Well, you have to start with a distinction. You have to say this is different from that because, you know, Judge Reinhart has suggested a reason. Maybe that's not your reason. Maybe you have some other reason. And then you're going to be ready for me to ask, and why does it matter? Why does the decision you've come up with make a width of difference? Well, that is the distinction. The distinction that I was trying to draw is rates is one thing. In this case, this was a payment of money pursuant to the contract. Oh, money. Rates are money. Payments are money. You know, it's all money. It's all the same thing. But the rates are not money out of BPA's appropriation. Here they were cutting a check. Does that make this different than everything else, that they're cutting a check? That's precisely right. It's a question. There's no right or wrong about it. You can say yes, it is, and then I'm going to say, why does it make a difference? Yes. What is the difference between if your household income is saying, I'm writing a check, as opposed to saying, instead of writing a check, we're going to take away 10 percent of your salary. So the money coming in is going to me. It doesn't make any difference whether I'm writing a check or whether it's taken out of my income. How is that different? How are they different? Your Honor, in this particular case, it was not rate-making. Bonneville was not. Bonneville certainly can't. We know that. That's what you're saying. It's one of those old concepts like privity, that it's not just because it's all money, we've got all these legal rules that may not make much sense, but that there is a difference between just making an error in calculating a rate and acting beyond statutory authority in giving away money you're not allowed to give away. As Judge Berzahn said in her opinion, it's just making a gift of public funds, which is a different category of error than making a ministerial error in calculating rates. That's right, Your Honor.  not just about making a gift of public funds, it's about making a gift of public funds. Are you relying on the Appropriations Clause of the Constitution? Yes, absolutely. The Appropriations Clause about spending money as opposed to setting rates or regulating or something like that? Absolutely, Your Honor. The Appropriations Clause, it forbids the spending of money without the proper authority to do so. And our entire argument at the base of it is really rather simple. Bonneville spent money without the proper authorization and now has an obligation to do so. I've never seen a lawsuit, a private cause of action based on the Appropriations Clause. I understand that you can get into trouble if you are a fellow employee and you violate either the anti-deficiency or the impoundment statutes, because there are laws against it, and you could be disciplined, you could be fired, all sorts of things would happen. I've never seen a private cause of action under the Appropriations Clause theory. Is this the first case of its kind? Well, Your Honor, there are actually a couple of cases that we cited in our brief in which the government brought action after having realized its mistake, brought action to the private cause of action. No, no, you misunderstand. A private cause of action. Oh, Your Honor. A private cause of action being you guys are private, bringing a claim based on violation of Appropriations Clause. I've just never seen it. It's possible, but is this the first suit of its kind? Well, I'm not aware of any such case. This is a private cause of action. You are suing to review what the EPA did, and it gave some reasons for what it did. And you're saying those reasons don't hold up, and one of the reasons they don't hold up is because of the Appropriations Clause. That's one of the reasons. That's correct. That is our entire, that is our argument. I'm afraid I'm out of time at this point, so I'll reserve the remaining minute that I have and let Ms. Davison address the Court. Outstanding or mootness or one of those things, one of those doctrines. Like privity, Your Honor. Like privity, like privity. Thank you, Chief Judge Kuczynski. Good morning, Your Honors. May it please the Court, my name is Ms. Davison, and I'm here to ask you a question about standing. I'm sorry? Why does it matter whether your client has standing? Does it matter? Your Honor, Judge Berzon, that's actually a very good question. That's one. Good, good. That is one of the points that we are making. Well, why doesn't it matter? Wouldn't it be, if you don't have standing, we just go home and say, never mind. No, no, no, you know, you go away. But it's just, but you're only dealing, I mean, no one seems to be complaining about your colleague's standing. It's just your standing. So if somebody has standing, why does it matter if your clients have standing? Your Honor, we believe that it doesn't matter because we have a commonality of interest. We are raising. Somebody has standing, right? Yes, Your Honor. PPC, PNGC. I thought the argument was that nobody, some of these have standing. Yes, Your Honor. But they're not arguing nobody has standing. They're arguing you don't have standing. That's right. Only, the only argument on standing that is presented by the Respondents  And the other one is directed to IC&U. Well, since nobody really cares, why shouldn't we use the time on more significant questions? Well, Your Honor, I certainly am happy to reserve the rest of this time if you do not believe. This was my understanding of maybe-white-max, which is the contention that only you are complaining about the Port Townsend deal. Is that correct? That's correct, Your Honor. Is it correct that only you are complaining about the Port Townsend deal? That is correct. We are the only Petitioner that has raised issues about the Port Townsend contract and refund. However, the same issues are present in that contract, as are with APAC. So we still believe that there is a- Some of them are, and some of them aren't. I mean, some of the Port Townsend situation is a lot more complicated. First of all, it's a lot smaller, but it's also a lot more complicated because there's no direct contract, first of all, and there is no waiver clause. Is that correct? Yes, Your Honor. That is correct. So there is a piece of the other case that has no waiver clause, but a big chunk of it does have a waiver clause. And so there are somewhat different issues. So is that the answer to the question, that you in fact are – that the other plaintiffs are not complaining about Port Townsend and that's why it matters? Yes, Your Honor. You could look at it that way. However, we still believe that even as it relates to the legal issues that are present with the Port Townsend contract, that it is the same as Alcoa, and I – Some of them are, but isn't it true that some of them aren't? Well, Your Honor – Nobody's challenging the Port Townsend contract. It doesn't matter if the legal issues are the same if somebody has to be here challenging it. Yes, Your Honor, and that is us. The only other point I would make, Your Honor, is that – Why don't you need standing yourself? Why do we need standing? Why don't you? We do need – we do need standing, but we believe there is a commonality of interest. But the point that – But then that's raising that argument, right? So, you know, it has to be somebody here with an interest and also making the argument. Yes, you could – The fact that there's some presence that has standing, it doesn't do you any good, right? Yes, you could look at it that way, Your Honor, but one point I – What is there some other way of looking at it? What other ways are we looking at it? That we have a commonality of interest and that that is sufficient to confer standing. But the one point that I would like to raise is that the record of decision that is challenged here in the – this case is the same record of decision for Alcoa as it is for Port Townsend. I think you better make your standing argument. There's a whole separate section on Port Townsend that says different things. It says some overlapping things and some things that are not overlapping. All right. Your Honor, let me quickly tell you why I believe that we have standing. First and foremost, we have demonstrated through our affidavits and supplementation of the record that we have members who have these direct pass-through contracts. And if BPA's rates go up, our rates go up directly. There's no subjectivity about that. If they go down, our rates go down. Again, refunds issued, we directly get the benefits of those refunds. The contract said that you get a refund if there's a refund. That's correct. Because it is directly tied to the rate that is charged to the COU, the consumer-owned utility. That – But I believe – I mean, I gather in the other case where the BPA did do something like a refund, what they actually did was a set-off against future rates. Is that right? In that – in the case having to do with the housing stuff, whatever it was? Yes, Your Honor. I believe you're talking about the residential – That's what happened here. Would that come back to you? Yes, it would, Your Honor. Yes. So we have a very direct financial interest or injury. I think that the Northwest Power Act clearly establishes that we have – we're within the zone of interest. And what I would point you to is that 16 U.S.C. 839.3 states that the purpose of the Northwest Power Act is to provide for the participation and consultation of the Northwest State's local governments, consumers, that's us, customers and the public at large in developing regions. But my understanding is that you are not contending that any – you know, I don't know why I keep coming up here, but if I lived in Oregon and I got power that was indirectly through BPA, could I bring this case? No. And that's because – and I'm a consumer, so the reason you're different is? We are different, first, because we consume large amounts of power, and that's why we have these direct pass-through contracts. Our members consume over 10 percent of BPA's total power. Well, that doesn't matter, right? You know, little claims, big claim, it doesn't matter. It may not behoove a single homeowner to bring a lawsuit because it would be so expensive, but let's say they get pro bono representation and they go to court, it seems to me to be the same, right? So why wouldn't a single utility user be in the same position? With all due respect to the argument, Your Honor. Just give me an answer. Forget about the respect. Just give me an answer. The answer is, is that the residential consumer is not like us. They would not be entitled to a direct pass-through contract because they're not – Why? Why? Why? Because they're not consuming enough power to matter. We consume so much power. In some instances we have a direct pass-through contract because we're using so much electricity, we are a major portion of their load, and because of that, we have these direct pass-through contracts, we have these direct relationships, and we have a direct  pass-through contract because we are a major portion of their load, and because  load, and we are very keenly interested in the issues. It costs a lot of money to participate in BPA proceedings. The average member of the public couldn't afford to do that. You have to hire experts. It's a very time-consuming process. And we are – All you're saying is that a regular homeowner wouldn't be able to afford a lawsuit or wouldn't be worthwhile to do it, but I don't know what that has to do with whether they have a claim or have standing. I mean, the bill you get in the mail is directly dependent on what BPA charges for power, right? I assume that Oregon is the same as California. I give you a big, long list of numbers, and I say, you know, it doesn't mean anything. Your Honor, I'm not going to concede that a residential ratepayer has standing. But what I will point out to you is that issue is not before the Court. What is before the Court is whether IC&U has standing and its members have standing. And I believe that we have demonstrated through the affidavits that we do, in fact I would like to have three or four sentences about the merits, since you're the only person who's – Yeah, I would, too. I think that was what I was trying to suggest. We've got a lot of difficult merits questions, and I think we ought to try to get to them. I'm sorry. You're the only party who we've established now who is dealing with the poor towns in question. So if you could give us, you know, a two-minute – if Judge Kaczynski, if Chief Prosecutor Kaczynski could give us a two-minute rendition of why you should prevail on the merits with regard to the poor towns and the special issues that go to poor towns, that would be helpful. Well, follow with me, but just don't waste any time on respect or any of that other stuff. Just give an answer to the question. Thank you, Your Honor. I appreciate the opportunity to sum that up. You're doing it. I'm sorry. I'm from the South. I've been taught to be respectful. I'm sorry. Just do it. Just do it. We have a very direct financial interest. Electricity is a key component of the cost. That's not what I'm asking you. I'm asking you why you should win with regard to the poor towns and contracts and the refund question on the merits. We should win, Your Honor, because of the Central Arizona Water Conservation District v. EPA case. You're not talking about standing. Oh, I'm not. I know, but she also told us that she's the only party that is dealing with the poor towns and contracts. And that's why I'm trying to get her to tell me about why you should win on the merits with regard to the poor towns and contracts. No one else here is going to tell me that because you're the only person who was contesting it. I apologize, Your Honor. I did not understand your question. Now that I understand what you want me to do, I can completely shift gears and not talk about standing anymore. Just do it. I don't understand. Just do it. Okay. Don't blame me. Just do it. Okay. Poor towns and contracts was found to be invalid and illegal. The process that EPA went through, they concluded that they had a contractual relationship with Clallam and not with Port Townsend. They concede in the record of decision that they undercollected for that contract as compared to the IP right. The essence of what BPA concluded in the record of decision was that, gee, if we go after this money with Clallam, we're not sure that Clallam is going to be able to collect this money from Port Townsend. So we feel bad for Clallam, and we're not going to go after this money because we don't have a direct avenue with Port Townsend. Number one, they don't know whether Port Townsend was going to pay the money back or not. Number two, I don't believe that it is BPA's responsibility to look after Clallam. They had a legal right to go or a legal obligation to go after this money. They acknowledge it in the record of decision, and they simply choose not to because they don't have a direct relationship with Port Townsend. That has now changed. The current contract with Port Townsend and BPA does not involve Clallam. It is a direct relationship. They simply could have added on to the money that's owed by Port Townsend in the current contract. Thank you, Your Honor. Roberts. Thank you. We'll hear from the other side. Good morning, may it please the Court. I'm John Wright, representing Bonneville Power Administration. I'll have the floor for 15 minutes of my 20 minutes of time, and then we'll listen. Were you in Congress before? I beg your pardon? Were you in Congress? You said you were going to have the floor. I'll have the podium. For 15 minutes, and then I'll cede five minutes of my time to Mr. Dotton, who represents Alcoa. I wanted to get quickly to the merits, but since you had such a lively exchange of outstanding, I did want to note that BPA filed a letter with the Court indicating its belief that the APAC case may be dispositive of that issue because APAC and ICNU are very similar organizations in that they represent retail customers of BPA's preference customers. And the reason that we challenge standing is this. Is the APAC people also large industrial users or is it consumers? For the most part, they represent only BPA customers. They represent retail customers of BPA utilities, preference utilities. Now, ICNU represents a broader range of customers, and they also represent the retail consumers of investor-owned utilities, but both tend to represent the larger consumers, retail consumers. Bonneville doesn't think that issue is dispositive, and the reasons are that they have no statutory right to purchase power directly from Bonneville. They have no statutory right to any kind of rate protection. These retail consumers that are the members of ICNU and APAC, they have no statutory right to buy power directly. So what? Well, I think the rights are purely derivative of their ability to contract with the wholesale utility provider. But it was the same thing. They say, look, we've got people who have these pass-through contracts. When their rates from BPA go down, our rates go down. Right. But the same is true for any retail customer. It's a matter of scale. And scale is kind of in the eye of the beholder. Small retail customer with the ---- My feeling is we've ---- this is sort of the tail wagging the dog of this case, right? I mean, the whole Port Townsend question is still ---- that's the only reason any of this matters, is that right? You don't have any problem with the other ---- Your point is exactly right. The Port Townsend issues are only being challenged by ICNU, and that's why standing is an important issue in this case. If I could proceed to the merits. Okay. The purpose of this proceeding is to review Bonneville's response to issues identified by this Court in PNGC 1 and 2 that had not been addressed in the previous record. In response, the administrator has made three determinations. First, he decided that the damage waiver provision is a reasonable exercise of his contract authority and remains enforceable in light of the severability analysis. Second ---- First of all, that aspect of it, the remaining enforceable despite severability, was not an issue in the later Alcoa case, because that was a valid contract. Right? I'm sorry. I didn't quite ---- The second part of what you said, i.e., whether the waiver clause remains viable despite the invalidity of the Alcoa payments in both of the other cases, was not an issue in the later Alcoa case, which upheld the waiver for a valid contract. Is that right? In other words, I'm trying to figure out what is the precedential effect of the recent Alcoa case with regard to the waiver. The Alcoa case looked at a damage waiver provision that was for all intents and purposes identical to this. Well, first of all, it wasn't. It seemed to me that just from a very ---- it was very curt there, but I gather that it may have said part or all of the contract, and this one didn't say that. I think the changed language in the later contract was an effort to clarify what Bonneville thought was already clear. And if you look at the language of the damage waiver before the court, it says that in the event that a court renders the contract void or otherwise unenforceable, the parties relinquish any claims that they might have against one another. That's ---- the use of the word or is very significant there because it ---- But otherwise unenforceable is the contract. It didn't say part of the contract. But leaving that aside for the moment, what about the fact that there was no issue in that case of their survival of the waiver? That's true. The Court did not resolve the severability issue in that case. In Alcoa? True. Yes, Alcoa. That issue was not before the Court. It wasn't the Court in the earlier case here, cases here. It is an issue here, severability. And in the earlier cases, the earlier BPA cases, it wasn't resolved there. That's correct. It wasn't resolved, but it was mentioned and it was remanded. The Court in PNGC 1 and 2 instructed the administrator to address the severability issue, and he has done so and determined ---- But I thought, and I'm relying on the opinion and not from recollection, that the severability reference there was to the fact that there was in the earlier ---- the first earlier contract a provision for the last two years which would have allowed BPA to unilaterally, because it wanted to sell power rather than give away money, and I thought that that was what the severability discussion referred to. I mean, there was no suggestion, and it seems like a very odd suggestion, that if you have an agreement which is simply overall void, that you still have rising out of the ashes a waiver provision. Well, the power sale option is important to this determination. There was a power sale option built into the contract. Once the monetized construct was invalidated, then that ability to call on that option was either in existence or was reinstated due to the invalidation. The administrator ultimately did not choose to exercise the option, but that's the beauty of an option. It gives you more flexibility. You can exercise it or not at your choice. The administrator moved on to ---- But how does that help in knowing whether the waiver provides the death of everything else that mattered in the contract, everything, as it turned out? Well, it's related to the issue of whether there is separate, independent consideration for the waiver. And to me, the waiver itself, it contains two separate promises, one from ALCOA that we won't come after you and one from DPA that we won't come after you. Two promises are enough to make a contract. But in this case, the petitioners have alleged that it's inextricably tied to the monetized provision. No, it's not. The language does not refer to the monetized provision. It was a general limitation on remedies. Secondly, to the extent that independent consideration is required, as in some other form at some other place in the contract, the power sale option does just that. That was a one-way option. It was up to Bonneville. ALCOA didn't have any role in whether BPA could or would exercise that option. So ---- The second PNGC case, that contract doesn't have, didn't have a waiver. I mean, we apparently wrongly said it did, but it didn't have one. That's true. So whatever is true with regard to the preclusive effect of the ALCOA case as to the waiver, it doesn't apply to that contract. The nine-month period of the amendment for ALCOA and the entire Port Townsend contract were not subject to a damage waiver provision. And that goes to the second determination made by the administrator, which was, even in the absence of a damage waiver provision, there's no basis upon which he could undertake a claim for restitution that would have a reasonable probability of succeeding on the merits. Kagan in this other case, right? Excuse me? In that other case whose name I'm forgetting. Oh. In Portland, whatever case. He did have a ---- there was a waiver provision, and despite the waiver provision, they did seek essentially setoffs. I don't know if they got them. I don't know what happened to that case. That's true. The REP case, residential exchange program, I'm sorry for using the acronyms, was a completely different situation. The PGE opinion came out, and there was no question that what the Court was saying was that that contract was void ab initio. Essentially, the administrator had acted ultra vires. Why void ab initio? Why does any of that matter as to the authority to go after money that you improperly spent? Well, I'm of the opinion that Section 12b of the Bonneville Project Act requires the administrator to undertake the type of analysis that we did here. It says that the administrator may bring such suits in law or equity as in his judgment may be required to further the purposes of the Act. You just stood up and you ---- that's a discretion question. You just stood up and said we can't do it. We couldn't do it. And I want to know why you couldn't. In the REP case, the contract was void ab initio, and therefore none of the terms could survive. It's as if the contract never existed. I'm not talking about the part of the case that has the waiver in it. I'm talking about the other part. In the REP situation, there was no need to undertake the analysis that we're doing here regarding restitution. Why? Because a companion case came out the very same day and it determined that because the contract was void ab initio, the rates were defective and BPA needed to reset its rates. All right. So why isn't that from here? Then why isn't that binding on us with regard to that question? There's been no determination that the rates are defective, the rates on which this is based. What is your basic reason? I'm having trouble understanding why you say that you couldn't or are you still saying you couldn't have sued to recover the money? In the REP situation? In the interim contract where there's no statutory bar. The administrator undertook an investigation of whether there might be a claim pursuing restitution that would have some probability of success on the merits. He determined that the unjust enrichment theory was probably the most applicable, but that it was very unlikely that a claim for unjust enrichment could be sustained. Unlikely as a legal matter or because of practical problems? Both. Legally. Why what was the difficulty in recovering as a legal matter if you had an unauthorized gift, as it was called, of the funds to Alcoa? And that seems to get to the argument of the Petitioners that the appropriations clause would create an absolute duty for the administrator to seek recovery. But it's not necessarily. It's simply can the government, if somebody, if it's determined that the government gave away money that it had no right to give away, can the government has no authority, you're saying, or weak authority to go over it back and get it back? And, I mean, that's a strange argument in light of the fact that the government goes after people who it gives Social Security benefits to erroneously, and it goes and gets them back, and if it gives unemployment benefits to people erroneously, it's a mistake. It still goes and gets it back, the whole premise being we can't give money away, that it's not legal to give away. And if we give money and if we give Medicaid, Medicare benefits to doctors and we made a mistake, we go, the government goes and gets it back. It seems, you know, extremely implausible that if you now determine that you had no right to give them this money, that you can't get it back. Well, I think if you look at the line of cases that the Petitioner cited to for that very proposition, you will find that it's the government was either pursuing a claim in contract, quasi-contract, or pursuant to a specific remedial scheme that directed the government to retrieve such overpayments, as in Medicare and Social Security. The rod itself states that you can. It says that in words, you merely clarified, I'll skip the rest of it, that absent a limitation imposed by Congress, it doesn't bar recovery. By appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid, and that no statute is necessary to authorize the United States to sue in such a case. That stands for the proposition that the common law comes in if you don't have a specific statutory obligation to pursue a legal action. In this case, 12b of the Bonneville Project Act clearly states that the administrator may bring such suits in law and equity as in his judgment are required to further the purpose of the act. Moreover, there's no violation of the law. Okay. So that's not to say that there's no legal bar to this. It's just a question of examining the administrator's judgment. If in his judgment he wants to file a suit, he can. And if his judgment is that it's not worth a suit for some reason, then he can't. So that's what we're trying to find out. Then we have to look to the administrator's judgment. And what were the reasons the administrator made that judgment? One, he thought he couldn't bring a suit. Is that right? He could not – there was no legal theory that presented itself under quasi-contract that he thought would lead to a reasonable possibility of success. He does not believe that the appropriations clause has been violated in this case. But you don't need to violate the appropriations clause. It says if you pay money illegally, that's in this government funds, you pay it illegally, you don't need a statute to go sue and recover. Now, you're correct that in this case, it says that the administrator makes a judgment. But that's not any kind of a legal bar to filing a suit. And if the administrator's judgment is based on erroneous use of the law, then maybe his judgment has to be reconsidered. Well, I think the errors that were present in those Wirtz line of cases were errors as in if the government owed somebody under a contract $100 and then ended up paying them $200, that's the type of error that would be very strong. And here the government just gave the money away illegally without authority. That seems a lot worse than paying $200 by mistake instead of 1. In pursuit of developing a comprehensive plan for marketing Federal power from 2011 to 2007 to 2011, which is covered by the appropriations, the appropriations clause says that no money may be. For the fourth time, we're not talking about the appropriations clause. But I want to ask a slightly global question. We now have the Alcoa case. What happened in the Alcoa case is the court decided the validity of a already expired statute, I mean, contract, because of capable of repetition. There was another contract that was supposed to go into effect, and then it was essentially washed out. And Judge Bea suggested that that one was going to result in $600,000 or so, $600 million or so, going to Alcoa essentially as a gift again, although not as money. What I'm concerned about is that it seems to me the way this whole thing is spinning out, BPA can and seems to be intent on entering into a series of short enough contracts with BPA, some of them as the one – I don't know what happened to the one that Judge Bea was complaining about, but he seemed to think that it was, you know, again, clearly in violation of BPA authority because it was just trying to shore up Alcoa again. And if then there's a waiver clause in each of these contracts, and there's no way to decide them prospectively in enough time if they're short enough, and there's no way to get the money back. So this will just go on forever. I mean, now, why am I not – why should I not be worried about this? Because it did not go on forever. The administrator went to the drawing board. He developed a whole new decision-making model in response to the Court's opinion. But Judge Bea claimed, and I have no opinion on this because I, you know, but he viewed at least part of what was developed under that system as another $600 million of the money being given to Alcoa. And that part, I understand, and that part of the contract went away. As opposed to his right, is there any way, either prospectively or retroactively, that's ever going to be fixed? Could you repeat that, please? If he were right, is there any way, either prospectively or retroactively, that the rate – the consumer rate payers are ever going to get that money back? I think there are a lot of complicated issues around that. I'm just asking you – I don't want to get into whether he's right or not. Assume he's right. If he were right, that that contract was in fact another $600 million gift to Alcoa. I think at that point the Court's patience would be wearing very thin. But that, in fact, is not what we did. Yes, it's wearing thin, because I – or at least what do we do if it's wearing thin if we say in this case that BPA can put in these waiver clauses, they're enforceable, and not only that, even if they don't have any waiver clauses, BPA doesn't have to go get the money if it doesn't feel like it. We're not saying that Bonneville never has to go after the money. We actually did so in the REP situation. What we're saying here is this – But when I asked you why that was different, you said because that contract was – essentially you said because the Court told us to in that case. Yes, I said what? Essentially you said because the Court told us to in that case. The Court upheld the damage waiver. It also approved Bonneville's decision-making model that had been developed in the REP case. When I asked you why it was that you went after the money in that case and not here, you essentially said two things, as I understand it. One is the Court made us, and the second one is the Court made us. Well, yes, exactly. Well, which means that if the Court – if the Court is more respectful as we were in the two PGNC cases, i.e., we want to know what you think, then we're never going to do it. We didn't read the PNGC opinion in the same light that we did the PGE opinion. We're essentially saying if we have a choice, we're not going to do it. In our opinions, we can't do it, we won't do it, but they made us do it once. Well, they made us do it by having a separate ruling that the rates were defective. Not that Bonneville should go out and use the appropriations clause of the private right of action or something without some claim for relief or what have you. All I'm saying, it's no answer to what I – to my concern that you did it in the REP case, because you only did it in the REP case with your head tied up on your back and you don't plan to do it and don't plan to do it. Your Honor, I think that in this case, what we did, we worked very hard to fix the problem. We fixed the problem. We're using the same methodology now for the current DSI contracts, and they have – those have not been challenged. Judge Bea is right, and you went to an agreement like that, and it is $600 million in overpayment. No one's ever going to see that money. I think that what parties are often entitled to in administrative law proceeding is prospective relief. The Court finds that the rule is no good, and a big part of the relief is you get the rule fixed. And it's a secondary issue as to whether – We don't have time at this point. We'll give – you had reserved some time for our call, but you didn't get a chance to sit down, so we'll – Thank you for your indulgence, Your Honor. We'll give you three minutes. We'll give our call three minutes from the clock. May it please the Court. I'm Mike Dotton representing Alcoa. I think the Court's troubled by one thing, which is it views that there's been a windfall to Alcoa. Let me tell you what the Court said, because it's – I think it's a significant holding in PNGC-1. The Court said, We grant Alcoa's petition – remember that in PNGC, Alcoa was also a petitioner – as to its challenge to BPA's refusal to offer the aluminum DSIs, the amount of physical power requested at a rate established under Section 7C of the industrial – the industrial power rate, that is, prior to offering them a market-based rate or selling the power outside the region. The record in this case is very clear, that Alcoa paid $218 million in excess of the industrial power rate as a consequence of this contract. Alcoa didn't want the monetary benefit. It wanted physical power. And it petitioned the Court to challenge the contract that required it to take the monetary benefit. But – well, two things. First of all, BPA had no – you were also claiming that BPA had an obligation to pay you – sell you power, and the conclusion was that it did not. That's correct. So consequently, what – in some ways, what Alcoa wanted or didn't want is really not very relevant in the sense that BPA had no obligation to sell you physical power at any rate. Your Honor, what your Court did, and I think you wrote the opinion, was you remanded to BPA to make a determination. You asked them to make two determinations in this case, to consider the validity and the applicability of the damage waiver provision, and the agency will also need to consider Alcoa's argument that no refund is due because the aluminum company at the agency's demand purchased wholesale power at rates well above what it could afford. Now, I would modify – But, Your Honor, if you consider it, as I say, to give you any opinion on it. And moreover, you know, the agency really didn't rely on that hardly at all. It relied on all kinds of other things. But the one thing maybe as a matter of prudence it didn't rely on is the fact that Alcoa really wasn't injured. What we – what we ultimately told Bonneville in Alcoa's comments was that in the event that the damage waiver provision was found to be unlawful or Bonneville attempted to collect what it's calculated is about $104 million from Alcoa, that Alcoa would, as a consequence, bring an action before the Court of Federal Claims for the $218 million-plus million that it suffered as a result of BPA, not make it a physical policy. And you've got a reason as to why it didn't file this inaction? It did indirectly, Your Honor, and I think I can understand the reason they didn't. They didn't want to concede, in case this Court did decide that it should collect $104 – that Bonneville should collect $104 million. They didn't want to concede that there was a claim against them. But certainly Alcoa believes that there's a claim against them and would intend to pursue it in the event that this Court holds it. But that's not – we have to decide the validity of the BPA's reasoning on the reasons it gave us, and that isn't one of them. Well, this sticks to its national limitations. Is that still open? I believe it would be told here, Your Honor, because they're – because of the mutual damages waiver and if – and Alcoa has relied on the effectiveness of that mutual damages waiver to conclude that it doesn't have a claim, if Bonneville comes after them for $104 million, then at the very least it would have an offset of $218 million against the $104 million that BPA would presumably could claim. Okay. Thank you. Thank you. We're here. Or you are out of time. We'll give you a couple minutes for rebuttal. Thank you. Thank you, Your Honor. I really appreciate it. I just want to make three very quick points that pertain to Judge Berzon's discussion with Mr. Wray. If you look at the damages waiver clause, by its terms it doesn't apply. The word unenforceable stands in the same position as the word void in that they modify the term agreement. So the damages waiver clause very clearly says if the agreement is void or unenforceable, this Court did not declare the block contract void or unenforceable. Damages waiver clause doesn't apply. Point number two, even if the damages waiver clause does apply, it is unenforceable. And it is unenforceable because it is too closely tied to the illegal monetization provisions. And the reason it's too closely tied to the illegal monetization provision is because that's what allows BPA to achieve the very result that this Court found to be unlawful. And the third point is with regard to BPA's prior actions in the REP settlement agreement, which was the subject of the PGE case. That case, in that case the Court did not hold the contract void or unenforceable in any manner. That case does not state that in any words. In fact, in that particular case, the Court reinforced and approved BPA's authority to enter into contracts generally. The only thing the Court found is that part of the contract was BPA acted unlawfully in executing part of the contract. And BPA then took the Court's words and conducted a look-back proceeding. The situation in the REP settlement that was addressed in the PGE case is precisely the same as the situation that is addressed here. Sotomayor, what happened to that look-back proceeding? I.e., first of all, was there inclusion? Second of all, was it reviewed in court? Where is it? Actually, I believe, Your Honor, BPA conducted the proceeding and the money was refunded to the preference customers through retroactive – through, I think, future rates. It was no challenge in court? It is currently challenged in court. It is. It has not been briefed. It's a 2007 proceeding, Your Honor, that is pending in the Ninth Circuit. It's part of – The person hasn't been briefed. Your Honor, it's part of – there's a whole group of cases that involve challenges based on the residential exchange program, and that case is just tied up with the rest of the – the rest of the challenges. This Court recently, I believe in February, heard oral argument on a case which involved BPA executing a global settlement of all the residential exchange issues, and so that is pending review in this case. In the meantime, all the other cases are stayed. So there is an – there was an argument on it or there hasn't been an argument? There was an argument on the new REP settlement that has been executed. That's right. Thank you very much. Thank you. The case is argued and submitted. We are adjourned.
judges: Kozinski, Reinhardt, Berzon